IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| DOROTHY SNOW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 3:11-cv-813-MEF |
| | ) | (WO—Publish) |
| BOSTON MUTUAL INSURANCE | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are (1) Plaintiff Dorothy Snow's Motion for Summary Judgment
(Doc. #31), and (2) Defendant Boston Mutual Insurance Company's Motion for Summary
Judgment (Doc. #32).  For the reasons set forth below, the Court finds that Plaintiff's motion
is due to be DENIED, and Defendant's motion is due to be GRANTED IN PART and
DENIED IN PART.

**I.  INTRODUCTION**

This is an ERISA[1] case involving two distinct claims for relief brought by Plaintiff
Dorothy Snow ("Plaintiff" or "Snow"), the widow and designated beneficiary under a life
insurance policy issued to James Francis Snow ("Mr. Snow"), against Boston Mutual
Insurance Company ("Boston Mutual" or "Defendant") and Mr. Snow's former employer,
Meadowcraft, Inc. ("Meadowcraft"), for the payment of certain life insurance benefits.
Count I of Plaintiff's Amended Complaint alleges that Boston Mutual wrongfully denied

---

[1] ERISA refers to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001
*et seq.*

payment of approximately $115,000 in life insurance benefits in violation of 29 U.S.C. § 1132(a)(1)(B).  Count II of Plaintiff's Amended Complaint asserts an alternative claim for equitable relief under 29 U.S.C. §§ 1132(a)(3) and 1133 based upon Boston Mutual's breach of certain fiduciary duties it purportedly owed to Plaintiff as a Plan Administrator and claims adjudicator.

Plaintiff and Boston Mutual have filed cross-motions for summary judgment, each arguing in their briefs that they are entitled to judgment as a matter of law on both of Plaintiff's claims.  Specifically, Plaintiff argues that: (1) under the terms of the policy at issue, and in accordance with 29 U.S.C. § 1132(a)(1)(B), she is entitled to approximately $115,000 in life insurance benefits as a matter of law; and (2) Boston Mutual breached certain fiduciary duties that it owed to her, thus entitling Plaintiff to equitable relief under 29 U.S.C. §§ 1132(a)(3) and 1133.  Boston Mutual disagrees with Plaintiff, arguing that: (1) under the terms of the policy at issue, and in accordance with 29 U.S.C. § 1132(a)(1)(B), Boston Mutual is not obligated to pay any life insurance benefits to Plaintiff because her husband was not covered under the policy at the time of his death; and (2) Boston Mutual neither owed nor breached any fiduciary duties to Plaintiff that would entitle her to equitable relief under 29 U.S.C. §§ 1132(a)(3) and 1133.

In sum, this case boils down to two issues.  First, does Boston Mutual owe Plaintiff any life insurance benefits under the policy at issue?  Second, did Boston Mutual owe any fiduciary duties to Plaintiff and, if so, did it breach any of those duties, thereby entitling Plaintiff to any of the equitable remedies she seeks?  Each of these issues is addressed in turn

below.

## II.  JURISDICTION AND VENUE

The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 29 U.S.C. §1132(e)(1) (ERISA).  The parties do not contest personal jurisdiction or venue, and the court finds sufficient factual bases for both.

## III.  SUMMARY JUDGMENT STANDARD

### A.     Summary Judgment Standard

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To shoulder this burden, the moving party can present evidence to this effect, or it can show that the non-moving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof.  *Id.* at 322–23.

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, or answers to interrogatories, specific facts showing the

existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). A genuine issue of material fact exists when the non-moving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus, summary judgment requires the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Indeed, a plaintiff must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex,* 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.* After the non-moving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

**B.    Standard of Review Applicable to Count I of Plaintiff's Amended Complaint**

The Court will consider Plaintiff's claim under 29 U.S.C. § 1132(a)(1)(B), which arises from Boston Mutual's decision to deny payment of life insurance benefits, under the *de novo* standard of review because the policy at issue does not expressly grant "the administrator discretionary authority to make eligibility determinations or to construe the

plan's terms." *Anderson v. Unum Life Ins. Co.*, 414 F. Supp. 2d 1079, 1094 (M.D. Ala. 2006).  The parties do not contest that this is the appropriate standard of review applicable to Plaintiff's §1132(a)(1)(B) claim.

## IV.  PROCEDURAL HISTORY

On August 26, 2011, Plaintiff filed a Complaint in the Circuit Court of Randolph County, Alabama against Boston Mutual.  (Doc. #1-1.)   The case was timely removed to federal court on September 28, 2011.  (Doc. #1.)  Plaintiff filed an Amended Complaint on November 22, 2011 (Doc. #18), and Boston Mutual answered on December 6, 2011 (Doc. #21).  The parties agree that Plaintiff exhausted all of her administrative remedies before filing this suit, or that exhaustion of any such remedies would be futile.

As of the date of this Order, Meadowcraft, Mr. Snow's former employer and Boston Mutual's co-defendant in this case, has not appeared in or otherwise defended against this action.   As a result, the Clerk of Court entered a default against it.[2]   (Doc. #25.) Meadowcraft is believed to be a defunct company that has ceased operations.[3]

On October 3, 2012, Plaintiff and Boston Mutual filed cross-motions for summary judgment (Docs. #31 & 32), which are now before the Court and ripe for disposition.

---

[2] Although the Clerk of Court has entered default against Meadowcraft, no default judgment has been entered against it.  *See Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 864 n.5 (11th Cir. 2007) ("A clerk's entry of default, pursuant to Rule 55(a), is distinct from a judgment by default entered by the clerk, pursuant to Rule 55(b)(1), or by the court, pursuant to Rule 55(b)(2).").

[3]  Meadowcraft filed for Chapter 11 bankruptcy on July 3, 2002, and the bankruptcy was closed as of August 27, 2007.  *See* In re: Meadowcraft, CV-02-06910-TOM11.

## V.  FACTS

The Court has carefully considered all deposition excerpts and other evidence submitted in support of and in opposition to the parties' summary judgment motions.  The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts:

### A.  The Snows

Plaintiff is the widow of Mr. Snow, who passed away on August 27, 2009.  (Affidavit of Dorothy Snow ("Snow Aff."), Doc. #33-8, at ¶ 3.)  Mr. Snow was sixty-six years and nine months old at the time of his death.  (Certificate of Death, Doc. #33-2, at 16.)  Plaintiff is the primary beneficiary designated to receive the life insurance benefits at issue in this case. (Snow Aff., Doc. #33-8, at ¶ 3.)  Beginning on October 25, 1993, Mr. Snow worked as a warehouse supervisor for Meadowcraft until he became disabled on May 17, 2002.

### B.  The Group Life Insurance Plan

Meadowcraft maintained Group Policy No. 24661 (the "Plan") for its full-time employees, which included Mr. Snow.  (Doc. #33-1, at 1.)  This Plan was underwritten and issued by Boston Mutual and became effective on August 1, 1999.  (Doc. #33-1, at 1.)  The amount of life insurance benefits at issue here is approximately $115,000, and if these benefits are due to be paid to Plaintiff, Boston Mutual would be solely responsible for paying them.

Under the Plan, when a disabled employee's Waiver of Premium claim is approved, his life insurance:

> will be kept in force: (1) with no further premium cost to him or to the Policyholder; (2) for the life amount in effect at the time; (3) for as long as he is disabled; (4) whether or not the plan stays in force; (5) *but in no event beyond the Normal Retirement date in effect as of the date of . . . disability*.

(Doc. #33-1, at 7) (emphasis added).   Additionally, an employee's insurance under the Plan stops:

> on the first of the following dates: (1) when the Plan stops; (2) when he is no longer eligible for insurance under the Plan; (3) at the end of 31 days from when the last premium was due and not paid if the employee is required to pay part or all of the cost of his insurance; (4) when he leaves his job.  But if he leaves his job due to disability, . . . the Policyholder . . . may keep the employee's insurance in force until the Policyholder . . . chooses to stop it *or until the employee's normal retirement date*, *whichever is earlier*.

(Doc. #33-1, at 8) (emphasis added).  The Plan defines "Normal Retirement Date" as the "normal retirement date provided for by the Policyholder's published or accepted personnel practices."  (Doc. #33-1, at 3.)

## C.    Mary Beth Wilbanks

Mary Beth Wilbanks ("Wilbanks") began working full-time for Meadowcraft as the Human Resources Coordinator for one of its plants in 1998.  In 2002, Wilbanks was promoted to serve as the Corporate Human Resources and Benefits Manager at Meadowcraft's corporate headquarters, where she was responsible for administering benefit plans Meadowcraft provided to its employees.  Wilbanks testified that her responsibilities included "adding new associates, deleting associates for whatever reason, termination, layoff, whatever we were experiencing, assisting associates with filling out claims if necessary, assisting associates with questions about their benefits."  (Deposition of Mary Beth Wilbanks ("Wilbanks Dep."), Doc. #35-6, 12:5–11.)  Wilbanks also testified that, in her position with

7

Meadowcraft, she "handle[d] enrollments, provide[d] documents to associates, maintain[ed] records, handle[d] billing[.]"   (Wilbanks Dep., Doc. #35-6, 52:17–53:8) (alterations to original).

## D.   The Certificate of Insurance

Following his enrollment, Mr. Snow received a Group Insurance Certificate ("Certificate") distributed by Meadowcraft.  (Snow Aff., Doc. #33-8, at ¶ 6.)  Like the Plan, the Certificate contains language regarding Waiver of Premium and when an employee's insurance stops, but the language contained in the Certificate concerning these two provisions differs in certain respects from that contained in the Plan.   For example, the Waiver of Premium language in the Certificate differs from the Plan to the extent it does not contain language terminating coverage at "the Normal Retirement date in effect as of the date of total and permanent disability."[4]  (Doc. #33-1, at 7.)  The Certificate's language regarding when the employee's insurance stops differs in a similar way from the Plan (*i.e.*, the Plan provides that an employee's insurance stops whenever Meadowcraft chooses to stop it *or* until the employee's normal retirement date, whichever is earlier).[5]  (Doc. #33-1, at 8.)

---

[4]  Compare with the Waiver of Premium language in the Certificate, which states:

Once we approve a claim, your life insurance will be kept in force; (1) with no further premium cost to you or the Policyholder; (2) for the life amount in effect at that time; (3) for as long as you are disabled; (4) whether or not the Plan stays in force.  However, if the Plan states that your life amount would; (1) stop; (2) or reduce at a certain age or time, then the same will be true under this disability clause.

(Doc. #33-1, at 19.)

[5]  Compare with the language contained in the Certificate, which states:

Despite these differences, the cover page of the Certificate is clear that: "This booklet [*i.e.*, the Certificate of Insurance] is not part of the Plan." (Doc. #33-4, at 1.) Moreover, the Certificate itself provides that termination of benefits is governed by the terms of the Plan and not the language of the Certificate.

Boston Mutual did not provide Mr. Snow with a copy of the Plan following his enrollment. (Def.'s Resp. to Pl.'s Interrog., Doc. #33-7, at No. 8.) Indeed, it was not until this litigation ensued that Plaintiff requested and received a copy of the Plan from Boston Mutual.

**E.    Mr. Snow's Disability, Waiver of Premiums, and Meadowcraft's "Normal Retirement Age"**

While employed with Meadowcraft, Mr. Snow became totally and permanently disabled with Chronic Obstructive Pulmonary Disease ("COPD") and hypertension, leaving him unable to work from May 17, 2002, until the time of his death on August 27, 2009. (Snow Aff., Doc. #33-8, at ¶ 4.) Boston Mutual approved Mr. Snow's long-term disability claim. Mr. Snow applied for a Waiver of Premium under the Plan, which Boston Mutual approved on October 16, 2002. In its approval letter, Boston Mutual advised Mr. Snow as follows:

> Your insurance stops on the first of the following dates: (1) when the Plan stops; (2) when you are no longer eligible for insurance under the Plan; (3) at the end of 31 days from when your last premium was due and not paid if the Policyholder requires you to pay part or all of the costs of your insurance; (4) when you leave your job. If you leave your job due to disability, . . . the Policyholder may keep your insurance in force until he chooses to stop it.

(Doc. #33-1, at 20.)

> [T]his [Waiver of Premium] means that your insurance will remain in force as
> if you were still a regular employee except that no further premium payment
> will be required.  It is important to note that if the [Plan] under which you were
> insured provided for a reduction or termination of coverage at a certain time
> or age, your coverage will likewise reduce or terminate at such time or age.

(Doc. #35-2, at 2.)

In connection with its processing of Mr. Snow's Waiver of Premium claim, Boston Mutual requested that Meadowcraft fill out and return an "Employer's Statement" form, which requested information such as the dates of Mr. Snow's employment, a description of his job duties, his annual salary at the time of disability, the amount of his insurance coverage, and the "Current Normal Retirement Age in Company."  (Doc. #33-12, at 3.)  On October 2, 2002, Wilbanks completed and returned the requested Employer's Statement form, certifying that the "Current Normal Retirement Age in Company" was 65 years old. (Doc. #33-12, at 3; Wilbanks Dep., Doc. #35-6, 33:12–33:22, 61:22–63:10.)  Notably, on this form, Wilbanks did not certify or provide any information as to the "Normal Retirement *date*" for Meadowcraft employees.  (Doc. #33-1, at 7.)  Wilbanks testified that there were Meadowcraft employees who worked past the age of sixty-five and that, ordinarily, it was the individual employee who decided when to retire.  (Wilbanks Dep., Doc. #35-6, 23:5–10; 35:15–17.)  Wilbanks further testified that she could not recall how or where she obtained the age of sixty-five for purposes of the Employer's Statement form.  (Wilbanks Dep., Doc. #35-6, 33:12–22.)

While the information sought by Boston Mutual in the Employer's Statement form was intended to pertain to Mr. Snow's life insurance coverage under the Plan, Wilbanks

mistakenly listed on the form the policy number for an unrelated long-term disability policy (also provided through Boston Mutual), instead of the policy number for the group Plan. (Doc. #33-12, at 3.)

**F.    Notice of Termination of Mr. Snow's Group Life Insurance Coverage and Conversion to Individual Policy**

On November 20, 2007, Boston Mutual wrote to Mr. Snow and notified him that his group life insurance coverage under the Plan would terminate on November 21, 2007 (Mr. Snow's sixty-fifth birthday) "due to having reached the maximum age limit for this plan." (Doc. #35-2, at 20.)  Boston Mutual further advised Mr. Snow of his right to convert any amount of his life insurance, up to the total amount of coverage under the Plan, to an individual policy, and enclosed a Conversion Privilege/Request for Application form.  (Doc. #35-2, at 20–21.)

Mr. Snow completed the Conversion Privilege/Request for Application form on December 7, 2007, and returned it to Boston Mutual.  In the form, Mr. Snow indicated that he was interested in applying for $100,000 of individual life insurance coverage.  (Doc. #35-2, at 17.)  On December 17, 2007, Boston Mutual sent Mr. Snow a letter acknowledging its receipt of his Conversion Privilege/Request for Application form.  In this letter, Boston Mutual also informed Mr. Snow that $100,000 of individual life coverage would cost $452.55 per month and that he could enroll by returning an application along with his initial premium by December 30, 2007.  (Doc. #35-2, at 16.)  Plaintiff claims that Boston Mutual never sent the December 17, 2007 letter and that a conversion application was never provided to Mr. Snow. However, there is no dispute that Mr. Snow did not return a conversion

11

application or ever submit any premiums to Boston Mutual for an individual policy.  As a result, the Plan was not converted into an individual life policy.

**G.    Plaintiff's Claim for Life Insurance Benefits and Boston Mutual's Denial of Those Benefits**

Mr. Snow died on August 27, 2009.  On December 17, 2010, Plaintiff made a claim to Boston Mutual for payment of benefits under the Plan.  (Doc. #33-2, at 15.)  Boston Mutual received this letter on December 28, 2010.  (Doc. #33-2, at 13.)  On January 4, 2011, Boston Mutual denied Plaintiff's claim by letter, stating:

> We approved Mr. Snow's Waiver of Premium claim in October 2002, and his life insurance was continued without any further premium up until the date he attained his normal retirement, age 65.  He was given the option to convert the group life insurance to an individual life insurance policy; however, he did not elect this option.  Mr. Snow died after the termination of his Waiver of Premium benefit, no converted policy was elected, and therefore no insurance benefit is due.

(Doc. #33-2, at 13.)

Plaintiff made another request to Boston Mutual for payment of benefits on April 29, 2011.  In this request, Plaintiff claimed that Boston Mutual's contention that age 65 was the normal retirement age was false because "we have located numerous employees who were working at the plant past age 65."  (Doc. #33-2, at 12.)  Boston Mutual denied Plaintiff's claim on May 26, 2011, reasserting the same grounds for denial as it did in its January 4th letter.  (Doc. #33-1, at 27.)  Boston Mutual's denial decisions were not subject to review by Meadowcraft.  (Wilbanks Dep., Doc. #33-9, 41:5–11.)  Neither of Boston Mutual's denial letters notified Plaintiff of her right to sue to enforce the Plan under ERISA.

## VI.  DISCUSSION

**A.     Count I—Claim for Plan Enforcement Under 29 U.S.C. § 1132(a)(1)(B)**

In Count I of the Amended Complaint, Plaintiff seeks to recover life insurance benefits under the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B).[6]  In her summary judgment submissions, Plaintiff contends that she is due approximately $115,000 in life insurance benefits under the Plan because Boston Mutual's denial decision was "wrong."  Plaintiff contends that Boston Mutual's denial decision was "wrong" for a number of reasons, the majority of which stem from language in the Certificate differing from that contained in the Plan, and the Snows' subjective belief that the Certificate, rather than the Plan itself, controlled or defined Mr. Snow's coverage.  Boston Mutual contends just the opposite—that the Plan is clear that Mr. Snow's life insurance coverage terminated when he reached the "Normal Retirement Date" of 65 and, because he did not convert his group coverage to an individual policy, benefits are no longer available to Plaintiff under the Plan.  Both parties have moved for summary judgment on this claim.

While there is evidence that Plaintiff understood the Certificate to be the Snows' policy, and while Plaintiff has placed significant emphasis on highlighting the differences between certain language contained in the Certificate and that contained in the Plan, particularly as to the Waiver of Premium and "When Your Insurance Stops" provisions,[7] this

---

[6] This provision authorizes a civil action to be filed "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

[7] *Compare* Doc. #33-1, at 7, *with* Doc. #33-1, at 19 (Waiver of Premium provisions in the Plan and the Certificate, respectively); *compare also* Doc. #33-1, at 8, *with* Doc. #33-1, at 20 ("When Your Insurance Stops" provisions in the Plan and the Certificate, respectively).

does not make obsolete the well-settled rule that "summary documents, important as they are, provide communication with beneficiaries *about* the plan[;] . . . their statements do not themselves constitute the *terms* of the plan." *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011).  Indeed, as the Supreme Court explained in *Amara*, a claim for benefits under 29 U.S.C. § 1132(a)(1)(B) "speaks of 'enforc[ing]' the 'terms of the plan,' not of changing them," and such a claim must be premised on the terms of the Plan itself and not on summary or extraneous documents.  *Id.* at 1877.  Here, the Certificate Plaintiff relies on expressly provides that it is not a Plan document or otherwise part of the Plan.  (Doc. #33-1, at 1) ("This booklet is not part of the Plan.").  The Plan itself similarly provides that "[a]ny conflict between the terms of the certificate and the Plan will be decided in favor of the Plan."  (Doc. #33-1, at 11.)  Therefore, for purposes of this opinion, the Court will confine its analysis of Count I to the appropriate construction of the terms of the Plan itself, and not the terms of the Certificate or the Plan's alleged inconsistency with them.

With that being said, the Court must now determine whether a fact issue exists with respect to whether Boston Mutual's decision to deny Plaintiff life insurance benefits under the Plan was wrong.  This requires the Court to interpret Boston Mutual's denial decision under a *de novo* standard of review, with no deference being given to its previous decisions. Applying that standard, the Court finds that a fact issue exists as to the appropriate interpretation of "Normal Retirement date" under the Plan.

The Waiver of Premium provision in the Plan provides that once an employee's waiver of premium has been approved, the employee's insurance:

> will be kept in force: (1) with no further premium cost to him or to the
> Policyholder; (2) for the life amount in effect at the time; (3) for as long as he
> is disabled; (4) whether or not the plan stays in force; (5) but in no event
> beyond the *Normal Retirement date* in effect as of the date of . . . disability.

(Doc. #33-1, at 7) (emphasis added).  The Plan further provides that if an employee leaves

his job due to a disability, Meadowcraft may keep his insurance in force until it either

chooses to stop it or "until the employee's *normal retirement date*, whichever is earlier."

(Doc. #33-1, at 8.)  "Normal Retirement Date" is defined in the Plan as the "normal

retirement date provided for by the Policyholder's published or accepted personnel

practices."  (Doc. #33-1, at 3.)

The parties have presented conflicting evidence on what is considered to be

Meadowcraft's "Normal Retirement date."   According to Boston Mutual, this term is

unambiguous under the Plan.  To support this position, Boston Mutual relies on Wilbanks'

certification on the Employer's Statement form, dated October 2, 2002, that the "*Current*

Normal Retirement *age*" at Meadowcraft was "65."  Notably, however, Wilbanks does not

certify on the form the "Normal Retirement *date* in effect as of the *date of* . . . [Mr. Snow's]

*disability*," as required by the Plan.  (Doc. #33-1, at 7.)  While drawing a distinction between

the words "age" and "date" may seem like splitting hairs to some, the Court finds these

differences to be significant.  The Plan's coverage terminates at the "Normal Retirement

*date*," not *age*, of an employee.  (Doc. #33-1, at 7.)  To a reasonable fact-finder, this could

result in coverage terminating at some age other than sixty-five.  Moreover, Meadowcraft's

"*Current* Normal Retirement *Age*," as represented in the Employer's Statement form (65),

could just as easily differ from the "Normal Retirement *date*" in effect as of the date of Mr.

Snow's disability (May 17, 2002).[8]  (Doc. #33-1, at 7.)

Additionally, the Plan defines "Normal Retirement Date" as the "normal retirement date provided for by the Policyholder's published or accepted personnel practices."  (Doc. #33-1, at 3.)  There is no evidence before the Court of any published personnel policy from Meadowcraft designating its "Normal Retirement Date."  Plaintiff, however, has presented substantial evidence that Meadowcraft had an accepted practice of allowing its employees to work and retire past the age of sixty-five.  (Wilbanks Dep., Doc. #35-6, 35:15–17.)  Indeed, Wilbanks testified that the individual employee ordinarily decided when to retire.  (Wilbanks Dep., Doc. #35-6, 23:5–10.)  At the very least, this evidence contradicts the Employer's Statement form and creates a factual dispute as to what is Meadowcraft's "Normal Retirement Date" based upon its "accepted personnel policies."

In construing life insurance plans governed by ERISA, the Court is guided by the federal common law rules of contract interpretation.  Under those rules, the Court interprets the terms of a policy in an ordinary and popular sense, as would a person of average intelligence and experience.  When terms in a plan are ambiguous, the Court must construe them strictly in favor of the insured; contract language is considered ambiguous if it is subject to more than one reasonable interpretation.  *See Cannon v. Wittek Companies, Intern.*, 60 F.3d 1282, 1284 (7th Cir. 1995).  In this case, the Court is satisfied that the term "Normal Retirement date" as defined in the Plan is ambiguous, as the evidence suggests that there is

---

[8]  For example, an employer's "normal retirement date" could be 30 years after the employee's date of  hire, which would result in different retirement ages depending on when a particular employee was hired.

more than one reasonable interpretation.   Accordingly, when construing the Plan language in favor of the insured, the Court finds that there is a genuine dispute of material fact as to what constitutes the "Normal Retirement Date" under the Plan.  As such, both parties' motions for summary judgment as to Count I of Plaintiff's Amended Complaint are due to be DENIED.

**B.     Count II—Breach of Fiduciary Duties under ERISA's "Catchall" Provision, 29 U.S.C. § 1132(a)(3)**

In Count II of the Amended Complaint, Plaintiff seeks "equitable relief" for Boston Mutual's breaches of alleged fiduciary duties under ERISA's "catchall" provision, 29 U.S.C. 1132(a)(3).[9] Thus, to prevail on Count II, Plaintiff must be able to establish through record evidence that Boston Mutual owed her a fiduciary duty and that it breached that duty.

Plaintiff alleges that Boston Mutual owed and breached the following fiduciary duties: (1) the Plan Administrator's duty to provide summary plan descriptions; (2) the Plan Administrator's duty to provide accurate and complete information; (3) the Plan Administrator's duty to provide all material information related to benefits and coverage; and (4) the claims adjudicator's duty to comply with ERISA's claims procedures.  (Doc. #33, at 42–52.)  As to the three Plan Administrator duties, Boston Mutual claims that it never owed Plaintiff these duties under the Plan.  As to claims adjudicator duty, Boston Mutual likewise claims that it did not owe Plaintiff any such duty and further claims that, even if it did, there

---

[9]  This provision authorizes a civil action to be filed "by a participant, beneficiary, or fiduciary . . . (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) enforce any provisions of this subchapter or the terms of the plan."

17

would be no substantive remedy for the breaches Plaintiff alleges.

    **1.**    **Plan Administrator Duties under 29 U.S.C. § 1021(a) and Cross-Referenced Provisions**

Plaintiff alleges that Boston Mutual, as a Plan Administrator, owed her a fiduciary duty to supply adequate disclosures and properly report under 29 U.S.C. § 1021(a), which imposes disclosure duties upon Plan Administrators. Accordingly, to resolve this claim, the Court must first determine whether Boston Mutual is a Plan Administrator under ERISA.

ERISA places responsibility on Plan Administrators to furnish plan participants and beneficiaries with: (1) a summary plan description ("SPD") in accordance with § 1022(a)(1); and (2) other statutorily mandatory information described in §§ 1021(f), 1024(b)(3), 1025(a), and 1025(c). 29 U.S.C. § 1021(a). Although the parties vigorously dispute in their briefs whether Boston Mutual is a Plan Administrator under ERISA, the statutory language provides clear guidance on who is considered a Plan Administrator for purposes of these duties.

ERISA defines the term "administrator" to mean:

> (i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary [of Labor] may by regulation prescribe.

29 U.S.C. § (3)(16)(A). ERISA defines "plan sponsor" to mean "the employer in the case of an employee benefit plan established or maintained by a single employer." 29 U.S.C. § (3)(16)(B)(i).

Nowhere in the Plan is Boston Mutual designated as the "administrator" (Doc. #33-1,

at 1–15), and Plaintiff does not claim or provide any evidence demonstrating that Boston Mutual falls within the statutory definition of Plan Sponsor such that it worked to qualify as the Plan Administrator.  *See* 29 U.S.C. § (3)(16)(A)(i)–(ii).  Nor is there any evidence that the Secretary of Labor has designated Boston Mutual as the Plan Administrator.  *See* 29 U.S.C. § (3)(16)(A)(iii).  As such, there is no basis for finding Boston Mutual to be the Plan Administrator under ERISA.

To the contrary, the undisputed evidence establishes that Meadowcraft, rather than Boston Mutual, is the Plan Administrator in this instance.  There is no dispute that Mr. Snow's employer was Meadowcraft.  There is also no dispute that the Plan was "established or maintained by a single employer"—Meadowcraft.  Thus, while Meadowcraft may not have been expressly designated as the administrator in the Plan, it qualifies as such by virtue of being a "plan sponsor."  Therefore, Meadowcraft, not Boston Mutual, would be the proper defendant in an action for breaches of Plan Administrator duties under ERISA.  *See* 29 U.S.C. § 3(16)(A)(ii), (B)(i).

It is understandable that Plaintiff wishes to recover from Boston Mutual for alleged failures to report and disclose material Plan information, especially considering that Meadowcraft is no longer in operation and will likely be unable to satisfy any judgment that may be entered against it.  This reality, however, still does not alleviate Plaintiff of her burden to establish the essential elements of her claim, which, when considering the clear statutory language and the evidence before the Court, she has failed to do as there is insufficient evidence that Boston Mutual qualifies as an administrator under the Plan.

### 2.     Claims Adjudicator Duty under 29 U.S.C. § 1133

In addition to her theories of recovery premised upon Plan Administrator duties, Plaintiff also seeks relief for Boston Mutual's alleged breach of its duty, as claims adjudicator, to comply with ERISA's claims procedure provision. *See* 29 U.S.C. § 1133.[10] Plaintiff claims numerous violations of statutory and regulatory procedures under § 1333 and requests equitable relief "estopping [Boston Mutual] from enforcement of . . . added terms" to the Plan.  (Doc. #33, at 48–52.)  Boston Mutual contends that its denial letters are not subject to § 1133's requirements, and even if they were, Plaintiff has not identified a "substantive harm" to the exercise of her rights under ERISA that was caused by these alleged violations.  (Doc. #40, at 29.)

The Eleventh Circuit has held that while "ordinarily, violations of ERISA's procedural requirements do not entitle a claimant to substantive relief[,]" a certain quantity of procedural violations "may work a substantive harm" by tainting the claim adjudication process such that a claimant may be entitled to substantive relief. *Harris v. Pullman Standard, Inc.*, 809 F.2d 1495 (11th Cir. 1987) (affirming district court's finding that defendant's procedural violations were so numerous and egregious that they established that defendant "acted arbitrarily and in bad faith when interpreting and implementing its policy," thus entitling plaintiffs to an award of benefits).  Plaintiff alleges procedure violations in Boston Mutual's

---

[10]   This provision states that "every employee benefit plan shall . . . (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

denial letters, namely, that Boston Mutual did not give Plaintiff required notice of her ERISA rights.[11]  (Doc. #33, at 49–50.)  However, even if such violations did occur, there is no evidence of numerous and egregious violations of such an extent that Plaintiff incurred a substantial harm to her ERISA rights.  Indeed, it is absurd for Plaintiff to claim that Boston Mutual's failure to notify her of certain ERISA rights in its denial letters somehow compromised those rights when she fully exhausted her administrative remedies under the Plan and has timely filed file and fully pursued this action.

Given the lack of any evidence showing an alleged substantive harm to Plaintiff's ERISA rights caused by the alleged procedural violations in Boston Mutual's denial letters, Plaintiff's theory of relief premised on violations of 29 U.S.C. § 1133 fails as a matter of law.  Accordingly, for the reasons set forth above, Boston Mutual's motion for summary judgment with respect to Count II of Plaintiff's Amended Complaint is due to be GRANTED, and Plaintiff's motion for summary judgment with respect to Count II of the Amended Complaint is due to be DENIED.

## VII. CONCLUSION

In accordance with this Memorandum Opinion and Order, Plaintiff Dorothy Snow's

---

[11]  Plaintiff claims that the first denial letter failed to include: (1) that Plaintiff has an opportunity to appeal the adverse claim decision; (2) that an appeal must be made within 180 days; (3) that Plaintiff has an opportunity to request plan documents or the claim file free of charge; and (4) that Plaintiff has a right to bring suit under 29 U.S.C. § 1332(a).  *See* 29 C.F.R. § 2560.503–1(g) (setting forth minimum requirements for denial letters under 29 U.S.C. § 1333).  Plaintiff further claims that the second denial letter failed to include: (1) that Plaintiff has an opportunity to request plan documents or the claim file free of charge; and (2) that Plaintiff has a right to bring suit under 29 U.S.C. § 1332(a).  *See* 29 C.F.R. § 2560.503–1(j) (setting forth minimum requirements for review determination letters under 29 U.S.C. § 1333).

Motion for Summary Judgment (Doc. #31) is due to be and hereby is DENIED, and

Defendant Boston Mutual Insurance Company's Motion for Summary Judgment (Doc. #32)

is due to be and hereby is GRANTED as to Count II and DENIED as to Count I of Plaintiff's

Amended Complaint.

DONE this the 15th day of January, 2013.


_____
/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE

22